# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### MAY SESSION, 1999

FILED

August 19, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 02C01-9802-CR-00053 |
| | ) | |
| Appellee, | ) | SHELBY COUNTY |
| | ) | |
| V. | ) | HON. BERNIE WEINMAN, JUDGE |
| | ) | |
| AARON A. WINTERS and | ) | (FIRST DEGREE MURDER; ESPECIALLY |
| DERWIN V. THOMAS, | ) | AGGRAVATED ROBBERY; CONSPIRACY |
| | ) | TO COMMIT MURDER; ESPECIALLY |
| Appellants. | ) | AGGRAVATED KIDNAPPING) |

FOR THE APPELLANTS:                    FOR THE APPELLEE:

**STEPHEN R. LEFFLER**                    **MICHAEL E. MOORE**
Counsel for Defendant Winters         Solicitor General
50 North Front Street, Suite 999
Memphis, TN  38103                    **PETER M. COUGHLAN**
                                       Assistant Attorney General
**GLENN I. WRIGHT**                    2nd Floor, Cordell Hull Building
Counsel for Defendant Thomas          425 Fifth Avenue North
200 Jefferson Avenue, Suite 300       Nashville, TN  37243
Memphis, TN  38103
                                       **JOHN W. PIEROTTI**
                                       District Attorney General

                                       **PAUL F. GOODMAN**
                                       Assistant District Attorney General

                                       **JENNIFER NICHOLS**
                                       Assistant District Attorney General
                                       Criminal Justice Center, Suite 301
                                       201 Poplar Avenue
                                       Memphis, TN  38103

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendants, Aaron A. Winters and Derwin V. Thomas, appeal as of right their multiple convictions in the Shelby County Criminal Court. In this appeal, Defendants present the following issues for review:

I. Was the evidence sufficient to convict the Defendants (Defendant Winters' Issue III and Defendant Thomas' Issues I and V);

II. Was Defendant Winters entitled to have his trial severed from that of Defendant Thomas (Defendant Winters' Issue IV);

III. Did the trial court err in admitting two photographs of the victims (Defendant Thomas' Issue II);

IV. Did the State violate the Brady rule (Defendant Thomas' Issue III);

V. Did the trial court err in admitting letters written by Defendant Thomas as statements against interest (Defendant Thomas' Issue IV);

VI. Did the trial court err in allowing lay witness Alvinse Fitzgerald to testify about Defendant Thomas' handwriting (Defendant Thomas' Issue VI);

VII. Did the trial court err in admitting Defendant Winters' statement to police and his letter to a third party (Defendant Winters' Issues I and II);

VIII. Did the trial court err in allowing the victims' family members to testify regarding the loss of the victims (Defendant Thomas' Issue VII); and

IX. Were the aggravators found by the jury in imposing Defendant Thomas' sentence supported by the evidence (Defendant Thomas' Issue VIII).

After a careful review of the record, we affirm the judgments of the trial court.

Procedural History

On February 8, 1996, the Shelby County Grand jury returned indictments against Defendant Winters, Defendant Thomas, and Sekour Barnes for especially aggravated kidnapping (two counts each), conspiracy to commit murder (two counts each), especially aggravated robbery, and first degree murder (two counts each). Defendants Winters and Thomas were tried together. The State asked for a severance of Barnes which was granted. Winters' first attorney filed a motion to sever but was later allowed to withdraw from the case. Winters' second attorney apparently did not pursue that motion.

The jury found Defendant Winters guilty of two counts of especially aggravated kidnapping and two counts of first degree murder. The jury found Defendant Thomas guilty of two counts of especially aggravated kidnapping, one count of especially aggravated robbery, and two counts of first degree murder. During the sentencing phase of the trial, the trial court allowed the following two aggravating circumstances to be submitted to the jury: that the murders were committed while Defendants were engaged in committing especially aggravated kidnaping and that the murders were committed while Defendants were engaged in especially aggravated robbery.

Defendant Winters received two consecutive sentences of life with the possibility of parole for the murder convictions. He was also sentenced to two 25 year sentences on the kidnapping convictions to be served concurrently with each other and the murder convictions. Defendant Thomas received two consecutive

sentences of life without parole for each murder conviction. He was also sentenced to 25 years on each kidnapping conviction and 25 years on the robbery conviction to be served concurrently to each other and the murder convictions. Both Defendants filed timely notices of appeal.

Factual Summary

On May 30, 1995, seventeen year old Ira West and sixteen year old Malik Rashad Asberry were killed in an abandoned house in Memphis, Tennessee. Both were shot at point blank range.

Kenji Lewis testified that he spoke with the victims earlier that day and that they said they were going to meet Defendant Winters and smoke dope. There was testimony that in reality, Defendant Winters was angry at the victims for calling his mother's house and disturbing her.

Rodney Edwards, a fourteen year old boy who sold drugs for Defendant Thomas, testified that he met Defendant Thomas on the afternoon of the murder to drop off drug money. He then asked Defendant Thomas if he would have a smoke with him and Defendant Thomas agreed. A car drove up at that moment with Defendant Winters, Sekour Barnes, the two victims, and two other men inside. Edwards, the two Defendants, the two victims, and Barnes then proceeded to walk to an abandoned house which was frequented by drug dealers and users.

Edwards testified that he heard Defendant Thomas tell Defendant Winters, "Let's get these n_ _ _ _ _s in the house so we can kill them." The Defendants went around to the front entrance, and Defendant Winters soon returned brandishing a gun at the two victims. Defendant Winters then began to force the victims into the abandoned house through a side window. One of the victims said he would give them anything he had on him, but he was grabbed by the neck and physically forced into the house through the window by Barnes. Barnes never actually entered the house. At some point, victim Asberry's necklace was taken from him. Edwards did not enter the house, but he did hear the victims begging and pleading for their lives. Edwards then heard four shots and he and Barnes ran in opposite directions from the abandoned house.

A neighbor found the bodies lying one on top of the other in the kitchen. The kitchen was used as a bathroom by drug users and was covered with human waste. Victim Asberry's shoes had been stolen. One victim had been shot in the head and the other had been shot in the neck.

After receiving a crimestoppers tip, investigators searched Room 230 of a nearby Motel 6. This was the room Defendant Thomas lived in and other people frequented. Defendant Thomas' wallet and victim Asberry's necklace were found in the same drawer in Room 230.

Defendant Winters was present when the search was conducted at the Motel 6. He told police he knew about the murder of two juveniles, and he took them to a vacant house where the murder weapon was hidden. Winters was then taken in for

questioning, and he admitted to being at the scene when the victims were killed. He described how each victim was shot, and how someone in the room removed victim Malik's shoes. He claimed he had nothing to do with the murders, but was only a witness to the murders.

Terrance Fitzgerald testified that he was with the Defendants after the murder and that he heard Defendant Thomas talking to Defendant Winters about killing two boys. Fitzgerald overheard Defendant Thomas say that one was shot in the neck and the other in the head. Defendant Thomas was talking about the struggling of one of the victims and how he had to be shot more than once. Fitzgerald also testified that Defendant Thomas took his revolver with him when he left the Motel 6 on the morning of the murders.

Alvinsea Fitzgerald, the sister of Terrance Fitzgerald and former girlfriend of Sekour Barnes, testified that she knew Defendant Thomas because a friend of hers had previously dated Defendant Thomas. Her friend and Defendant Thomas wrote letters to each other and Fitzgerald testified that she read Thomas' letters and knew his handwriting. Soon after the murders, she began receiving anonymous threatening letters telling her to keep her brother Terrance quiet. She recognized the handwriting as being that of Defendant Thomas.

Sekour Barnes testified at trial as to several letters given to him in jail by Defendant Thomas through an intermediary. The letters he discussed were reviewed by a State handwriting expert and determined to be written by Defendant Thomas. The letters were written to Mike Boyland, Tadarrio Britt (a.k.a. Tech 9), as

well as men nicknamed G. Wayne, Yo Yo, and Crazy Legs. In each of these letters, Defendant Thomas tells the recipient what to say, in detail, about their knowledge of the murders. The letters ask recipients to memorize their trial testimony, to contact him after they speak with investigators, and to destroy the envelopes but keep the letters to prepare for their testimony. The letters also promise help in the future for this testimony. The trial court admitted the letters into evidence as statements against interest.

## I. Sufficiency of the Evidence
### (Defendant Thomas' Issues I and V; Defendant Winters' Issue III)

### A. Murder conviction as to Defendant Thomas

Defendant Thomas alleges that the evidence was insufficient to convict him of murder because the proof only placed him at the scene of the crime. (Sufficiency of the evidence as to Defendant Thomas' robbery conviction is discussed in Issue IX.)

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). This standard is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences

therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 835. A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. Grace, 493 S.W.2d at 476.

Moreover, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1981). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude beyond a reasonable doubt every other reasonable hypothesis save guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971); Jones, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference

save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 306 (Tenn. Crim. App. 1987).

        Defendant Thomas told Defendant Winters, "Let's get these n_ _ _ _ _s in the house so we can kill them." Defendant Thomas then went to the front entrance of the house while the other boys forced the victims through the window, where they were ultimately murdered. Defendant Thomas had a conversation with Defendant Winters which was overheard by Terrance Fitzgerald. In that conversation, Defendant Thomas recalled that one of the boys was shot in the neck and the other in the head. Defendant Thomas also said that one of the victims struggled after he was shot and had to be shot again. Fitzgerald also testified that before Defendant Thomas left the Motel 6 on the morning of the murders, Thomas took his revolver with him. We find that there was certainly ample evidence that Defendant Thomas shot the victims in the abandoned house. Furthermore, numerous letters were admitted into evidence written by Defendant Thomas, telling witnesses to memorize the "scripts" he gave them about what to say in regards to the murders. A rational jury could have believed that Defendant Thomas did kill the victims. This issue is without merit.

B. Anthony question

        The issue presented for our consideration here is whether the Defendants' convictions for aggravated kidnapping violate due process and the mandate of State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), because these offenses were merely incidental to the primary purpose of committing first degree murder (and aggravated robbery as to Defendant Thomas).

Addressing the due process concerns of whether movement incidental to an underlying crime is sufficient to support a separate kidnapping conviction, the appellate courts of this state have recognized that inherent in every rape, robbery, and murder is a period of confinement or restraint. Thus, the courts are left to determine "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not . . . sufficient to support a separate conviction for kidnapping . . . in and of itself . . . ." Anthony, 817 S.W.2d at 306. In an opinion reiterating the principles of Anthony, our supreme court held that the focus of an Anthony inquiry is upon the "purpose of the removal or confinement and not the distance or duration . . . ." State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997). If the purpose of the removal or confinement is "not necessary for the commission of the [underlying felony]," the kidnapping is not incidental to the other offense. Id. We note, however, that there is no bright-line rule for determining whether the removal or confinement of a victim to another place is part of the accompanying felony. See State v. Joseph Tipler, C.C.A. No. 02C01-9611-CR-00384, fn. 4, Shelby County (Tenn. Crim. App., Jackson, Jan. 30, 1998), perm. to appeal denied (Tenn., Oct. 12, 1998) The test remains a subjective one, based upon the facts of each case. Id. If the "movement or confinement was beyond that necessary to consummate the [underlying offense]," the next inquiry is "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Dixon, 957 S.W.2d at 535 (citing Anthony, 817 S.W.2d at 306). Affirmative answers to these inquiries support affirmance of a contemporaneous kidnapping. See, e.g., Dixon, 957 S.W.2d at 535. Applying the due process principles announced in Anthony and under the guidelines of Dixon, we conclude

that the separate convictions for first degree murder as to both Defendants, aggravated robbery as to Defendant Thomas, and aggravated kidnapping as to both Defendants in the case before us was proper.

_____

### Defendant Thomas

Defendant Thomas argues that his convictions for especially aggravated kidnapping and especially aggravated robbery were based on a single criminal episode. He does not allege that his convictions for first degree murder and especially aggravated kidnapping were one episode. In Anthony, the supreme court noted that every robbery involved some confinement and, therefore, necessarily included a kidnapping. It ruled, however, that the legislature did not intend for every robbery to also be a kidnapping. Anthony, 817 S.W.2d at 306. The supreme court explained the limitation of the Anthony rule in Dixon as follows:

> The Anthony decision should only prevent the injustice which would occur if a defendant could be convicted of kidnaping where the only restraint utilized was that necessary to complete the act of rape or robbery. Accordingly, any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping.

Dixon, 957 S.W.2d at 534-35.

We first find that the movement of victim Asberry was beyond that necessary to consummate especially aggravated robbery. Defendant Thomas could have robbed victim Asberry outside of the vacant house. We next find that the act of forcing victim Asberry into the house effectively prevented the victim from summoning help, lessened Defendant Thomas' risk of detection, and increased the risk of harm to the victim. See, e.g., Dixon, 957 S.W.2d at 535. We conclude that

-11-

the evidence was certainly sufficient to warrant separate convictions for especially aggravated robbery and especially aggravated kidnapping.

### Defendant Winters

Defendant Winters specifically argues that the "evidence at trial presents a scenario where the kidnapping[s] [were] purely incidental to the offense[s] of murder." Although Defendant Thomas did not specifically raise this issue as relative to the murder convictions, the following analysis certainly applies to him as well. We believe the two acts of kidnapping were significant enough, in and of themselves, to warrant independent prosecution. The murders could have been committed outside the vacant house. After refusing to obey the order to get inside the house, the victims were forcibly moved where the Defendants wanted them to go which was inside the house. We also find that bringing the victims into an abandoned house where they would be out of sight was clearly intended to prevent the victims from summoning for help and to lessen Defendants' chances of getting caught. There was testimony that the victims pleaded for their lives before they were killed. According to that testimony, these pleadings were barely audible outside the house, further insuring that Defendants' would not be caught. Likewise, being inside the vacant house certainly increased the victims' risk of harm. The record is clear that Defendants' actions were not necessary for the commission of the murders. As such, separate convictions for first degree murder and especially aggravated kidnapping were appropriate. This issue is without merit.

## II. Severance

### (Defendant Winters' Issue IV)

Defendant Winters claims in this issue that the trial court erred by denying his motion to sever his case from that of Defendant Thomas and that this denial was prejudicial. Defendant Winters' first attorney filed a motion to sever on April 10, 1996. The attorney withdrew from the case on May 8, 1997, and it appears from the record that Defendant Winters' second attorney did not pursue the motion. No argument was ever heard on the matter, and no order was entered by the trial court either granting or denying the motion.

First, because this issue was not included in Defendant Winters' motion for new trial, it has been waived for purposes of appeal. A criminal defendant may make an appeal of right if the issue "was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). Second, it is a well-established rule of law that the failure to bring a motion to the attention of the trial court constitutes a waiver of the issue. See State v. Locke, 771 S.W.2d 132, 138 (Tenn. Crim. App. 1988), perm. to appeal denied (Tenn. 1989); State v. Aucoin, 756 S.W.2d 705, 709 (Tenn. Crim. App. 1988), cert. denied, 489 U.S. 1084, 109 S. Ct. 1541, 103 L. Ed. 2d 845 (1989); State v. Kinner, 701 S.W.2d 224, 227 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1985); State v. Burtis, 664 S.W.2d 305, 310 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1983). It was the responsibility of Defendant Winters to pursue the motion and obtain a ruling by the trial court on the motion. Accordingly, this issue is waived for this reason as well.

## III. Admissibility of Photographs

### (Defendant Thomas' Issue II)

Defendant Thomas alleges in this issue that the trial court erred in admitting certain photographs of the victims. The trial court found the photographs were not particularly gruesome and were necessary for the State's case.

Rule 403 of the Tennessee Rules of Evidence states that relevant evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice. Rule 401 states that evidence is relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence. Tenn. R. Evid. 401. Whether to admit relevant photographs is within the discretionary authority of the trial court and will not be reversed absent a clear showing of an abuse of discretion appearing on the face of the record. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978).

The photographs in question show the two victims in a filthy kitchen lying next to each other. We find the photographs to be relevant for several reasons. First, they show where the two boys were killed. The filth and decay in the kitchen is evident from the pictures. This supports the State's reasoning that the two victims would not be in that room willingly, but were rather forced into the room at gun point. Secondly, the photographs show how the boys were killed, in that Ira West must have been killed before Malik Asberry because Asberry is lying on West's arm. This corroborates Defendant Winter's statement to police about the order in which the

boys were killed. Third, the photographs show premeditation. While the deadly wounds themselves are not clearly shown, it is evident the boys were shot in the head, indicating the shooter intended the boys to die.

While there is blood in one of the photographs, the wounds themselves are not shown. The photographs are not pleasant; however, they are not the type of pictures that so inflame a jury as to make the prejudice of their admission outweigh their probative value. Therefore, we find the trial court did not abuse its discretion in admitting them. This issue is without merit.

## IV. Brady violation
### (Defendant Thomas' Issue III)

In this issue, Defendant Thomas claims that the State withheld certain exculpatory material from the defense until trial. Specifically, Defendant Thomas argues that a police report containing a typed sheet of crimestopper tips should have been provided to the defense. The tip he focuses on is one that alleges that "Yo," a fourteen year old black male, had blood on his pants at the rear of the vacant house at the time of the murder, and that William "Booty" Davis was seen armed with a .38 caliber pistol the day of the murders. The anonymous tip stated that the victims had "violated the code" and were therefore killed.

In Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See also Hartman v. State, 896 S.W.2d 94, 101 (Tenn. 1995). In order to establish a due process violation under Brady, four prerequisites must be met:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Id.

In determining the materiality of undisclosed information, a reviewing court must establish whether "in [the] absence [of the information] [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490 (1995). In other words, evidence is considered material only if there is a reasonable probability that had the evidence been disclosed to the defense, the results of the proceeding would have been different. Edgin, 902 S.W.2d at 390-91 (citation omitted).

Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, Brady normally does not apply,

unless the delay itself causes prejudice. <u>Sylvester Smith v. State</u>, C.C.A. No. 02C01-9801-CR-00018, Shelby County (Tenn. Crim. App., Jackson, Dec. 28, 1998), <u>perm. to appeal granted</u> (Tenn., July 6, 1999); <u>State v. Sydney M. Ewing</u>, C.C.A. No. 01C01-9612-CR-00531, Davidson County, (Tenn. Crim. App., Nashville, June 19, 1998), <u>vacated and reentered</u>, (Tenn. Crim. App., Nashville, Aug. 18, 1998); <u>State v. Jim Inman</u>, C.C.A. No. 03C01-9201-CR-00020, Campbell County (Tenn. Crim. App., Knoxville, Nov. 23, 1993) <u>perm. to appeal denied</u>, (Tenn., Knoxville, April 4, 1994). In this case it is clear that the delay in providing the report did not in itself cause prejudice.

In the present case, Defendant filed a Motion for Exculpatory Evidence which was granted by the trial court. However, the written police reports were not given to Defendant Thomas until after the testimony of Captain Houston at trial. In the reports was a crimestoppers tip page where an alleged eyewitness identified two individuals as being involved in the homicides. The police report provides in pertinent part as follows:

> The shooters involved in the drive by shooting live in the Longview Heights area. The murder victims found had violated the code and had to be beaten up. Involved in the double homicide are:
>
> 1. "Yo", male black, 14 years old, 4'3", looks like a baby, believe to live on Effie Street in a Duplex. Caller stated that he saw "Yo" with blood on his white pants directly in the rear of the vacant house where the bodies were discovered (Effie).
>
> 2. William "Booty" Davis, male black, 16 years of age, unknown home address is the shooter who was last seen armed with a .38 caliber pistol. He is under Juvenile Court house arrest and can be easily found.

Although this issue will be determined on the basis of prejudice rather than a strict Brady analysis, we emphasize that the police reports, containing the pertinent crimestopper tip, should have been turned over by the State to the defense prior to trial. The withheld information in this case was clearly favorable to the defendant since, on its face, two totally different suspects are implicated in the murders. Normally the defense should have had the opportunity to conduct further and possible fruitful investigation prior to trial regarding the leads given in a crimestoppers tip.

The State argues that the reports were not "material" because they would have been inadmissible at trial. The State is correct in that the reports themselves, as police reports, would have been hearsay inadmissible at trial. See Tenn. R. Evid. 801(c) and 803(8), Advisory Commission Comment. The primary problem with the admissibility of police reports is that the report is hearsay made up of opinion or conclusion not based on personal knowledge. See McBee v. Williams, 405 S.W.2d 668, 671 (Tenn. 1966). In addition, the crimestopper tip, even though contained in a police report, is not admissible as a business record where the declarant is not under a business duty to give the information. See State v. Allen, 692 S.W.2d 651, 653 (Tenn. Crim. App. 1985). However, the State is wrong in its assumption that because the report would have likely been inadmissible at trial that it was therefore not material information. The prosecution's duty to disclose is not limited in scope to "competent evidence" or "admissible evidence." The duty extends to "favorable

information" unknown to the accused. See State v. Marshall, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992).

Nevertheless, since the information was revealed to defendant, albeit during trial, we must determine whether the delayed disclosure was prejudicial. As discussed in Issue I, the evidence presented at trial against Defendant Thomas was overwhelming, and we do not find that disclosure would have altered the outcome in Defendant Thomas' case. We note for the record that defense counsel made no effort at the hearing for motion for new trial to show that the evidence was material. Defendant put on no witnesses to support the allegations in the crimestopper tip and no one testified as to what efforts, if any, were made to pursue the alleged "leads" of the named individuals in the tip, and whether anything of value came from that effort. Therefore, Defendant is not entitled to relief on this issue.

V. Admissibility of Letters

(Defendant Thomas' Issue IV)

In this issue, Defendant Thomas contests the admissibility of letters he wrote while he was incarcerated. The letters were written to various people telling them what to say about the murders and his own whereabouts on the day of the murder. They contain specifics about the murder, including details witnesses are specifically supposed to remember as well as things witnesses are supposed to "forget." They were admitted against Defendant Thomas, who did not testify at trial, as statements against interest. See Tenn. R. Evid. 804(b)(3).

We note that we are unable to locate a specific motion in the record regarding the suppression of the letters or an order granting or denying such motion.

Apparently though there was a pre-trial hearing on the matter held January 12, 1998. After reviewing the transcript from the hearing, it is unclear whether Defendant Thomas' objection to the admissibility of the letters was based on relevancy or hearsay. Regardless, the trial court ruled that the letters would be admissible at trial as statements against interest. See Tenn. R. Evid. 804(b)(3). At trial, Defendant Thomas did not object to the introduction of the letters.

After a thorough review of the letters, we find that they were not offered for the truth of the matter asserted (and thus not qualifying as hearsay), but to show that Defendant Thomas lied in an attempt to cover up his participation in the murder. See Tenn. R. Evid. 801(c). In other words, the record reflects that the State essentially intended to prove the falsity of the letters, not the truthfulness of the matters asserted in them. Even if the letters could be characterized as hearsay, they could have been properly admitted as admissions against a party-opponent. See Tenn. R. Evid. 803(1.2)(A). Although the trial court erred in its reasoning admitting the letters into evidence, we find the letters were clearly admissible for the reasons stated above. We also find that the letters were relevant because a jury could certainly have inferred that Defendant Thomas was attempting to get potential witnesses to perjure themselves to show that he was innocent of the charges against him. Also, Defendant's other allegations within this issue, that the State used the wrong process for admission of the letters and that some letters never reached the intended recipients, are meritless.

## VI. Lay Witness's Identification of Defendant's Handwriting

(Defendant Thomas' Issue VI)

Defendant Thomas alleges that the testimony of Alvinsea Fitzgerald identifying his handwriting in threatening letters he wrote to her was improper as the proper foundation was not laid.

A lay witness must be familiar with the signature and handwriting of the maker by personal experience in order to identify the maker of a handwriting. Tenn. R. Evid. 901(b)(2); State v. Harris, 839 S.W.2d 54, 70 (Tenn. 1992). The competency of the witness to identify particular handwriting is a matter for the trial judge's discretion. Id. at 70.

Ms. Fitzgerald lived with Defendant Thomas, his girlfriend, and others for several months in 1993 and 1994. During that time, she would be present when Defendant Thomas would write "love" letters to his girlfriend. Ms. Fitzgerald testified that she saw him write these letters "numerous" times. She also testified that she would read these letters as well. However, on cross-examination, she testified that she saw him write his girlfriend only one or two times.

The Rules of Evidence do not list a minimum number of times that a witness must have seen a particular handwriting before being able to testify as a lay witness regarding that handwriting. In the instant case, Ms. Fitzgerald lived in the same house with Defendant Thomas, saw him write letters to his girlfriend, and positively identified Defendant Thomas' handwriting at trial. We find that the trial court did not

abuse its discretion in allowing Fitzgerald to give her opinion that the threatening letters were in Defendant Thomas' handwriting. This issue is without merit.

## VII. Admission of Statement to Police and Redaction

### (Defendant Winters' Issue I and II)

### A. Winters' Statement

In this issue, Defendant Winters first alleges that his statement should not have been admitted into evidence. Specifically, Defendant Winters concedes it was proper to read the statement to the jury, but alleges it was error to allow the jury to take it into the deliberation room because it would place undue emphasis on the statement to the exclusion of all other evidence.

In the statement, Defendant Winters admits his presence at the crime scene but claims he was just a bystander. The statement was properly admitted as an admission of a party opponent. See Tenn. R. Evid. 803(1.2)(A). Furthermore, the trial court properly admitted the statement as substantive evidence. Defendant Winters' claim that the jury would "improperly" use the evidence is wholly unsupported by the record. The jury was properly instructed and is presumed to have followed its instructions. See State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985).

### B. Redaction of Winters' Letter

Defendant Winters next argues that the trial court erred in redacting a portion of a letter he wrote to a third party. He claims that the redacted version prejudiced

him in the eyes of the jury because it turned an exculpatory statement into a "virtual confession." The original version reads as follows:

> I Aaron Winters [Defendant] admit that me and Rodney Edwards was at the crime scene and Sekour Barnes didn't have anything to do with it and was not around at the time that this happen. And Derwin V. Thomas [Defendant] was the trigger man and said he was going to have me and Rodney Edwards killed if we said anything. And this was given without any threats of promises.

The redacted version is as follows:

> I Aaron Winters [Defendant] admit that me and Rodney Edwards was at the crime scene and Sekour Barnes didn't have anything to do with it and was not around at the time that this happen. And this was given without any threats or promises.

The statement of a non-testifying co-defendant implicating another defendant violates the constitutional rights of the latter in a joint trial. Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). The ruling in Bruton is based on the acknowledgment that "admission of a co-defendant's confession implicating a defendant at a joint trial constitutes prejudicial error even though the trial court may give clear, concise and understandable instructions that confessions could only be used against a co-defendant and must be disregarded with respect to any other defendant." State v. Bailey, 865 S.W.2d 7, 9 (Tenn. 1993). Post-Bruton cases make it clear, however, that the rule in Bruton does not apply to confessions which do not implicate the nonconfessing defendant. Also, Bruton does not apply to confessions from which all references to the nonconfessing defendant have been effectively deleted provided that, as deleted, the confession will not prejudice the confessing defendant. See White v. State, 497 S.W.2d 751 (Tenn. Crim. App. 1973). We note

-23-

that Defendant Thomas would not have a <u>Bruton</u> challenge to the redacted statement.

After a careful review of the Defendant Winters' original statement and the redacted version of his statement, we are of the opinion that the trial court did not err in redacting the statement in the manner it did. A redacted statement will be prejudicial if it "so alters its substance or deletes therefrom substantially exculpatory information." <u>Denton v. State</u>, 945 S.W.2d 793, 801-02 (Tenn. Crim. App. 1996) (citations omitted). Although the original version does say that Defendant Thomas was the "trigger man," which would be considered exculpatory information, this information is essentially redundant in that the jury was presented evidence that Defendant Thomas, not Defendant Winters, was the actual shooter. Defendant Winters admits only in the statement to being at the scene of the crime with Barnes and Edwards. This issue is without merit.

### VIII. Victim Impact Evidence
(Defendant Thomas' Issue VII)

Defendant Thomas alleges in this issue that the trial court erred in allowing the families of the victims to testify during the sentencing phase for the murder convictions. Defendant Thomas acknowledges that this was not a death penalty case, as the State withdrew its intention to seek the death penalty on August 8, 1997, but nonetheless asserts "the law regarding victim impact in capital cases should apply to all cases."

Neither Defendant Thomas nor Defendant Winters objected to the witnesses' testimony at the sentencing hearing until after they had testified. Therefore, this issue should be waived. See Tenn. R. App. P. 36(a). However, even if substantively addressed, this issue is meritless. First, this was not a capital case so the victim impact evidence was clearly admissible. Second, our supreme court recently held that victim impact evidence and argument is permissible under both the United States and Tennessee constitutions. See State v. Nesbit, 978 S.W.2d 872, 889 (Tenn. 1998). In addition, the court held that such evidence is permissible under the Tennessee capital sentencing statute because it is "relevant to punishment." Id. Even if the case sub judice was a capital case, after reviewing the victim impact testimony in light of the guidelines set forth in Nesbit, our conclusion that the testimony is admissible would be the same. This issue is without merit.

## IX. Aggravators and Sentencing
### (Defendant Thomas' Issue VIII)

In his final issue, Defendant Thomas argues that the aggravators were insufficient to support the sentences of life without parole and that the sentences are excessive. Because this issue was not included in Defendant Thomas' motion for new trial, it has been waived for purposes of appeal. A criminal defendant may make an appeal of right if the issue "was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). Even addressed on the merits, however, it is without merit.

A. Aggravators

The jury found that one murder was committed while Defendant Thomas was engaged in the commission of aggravated kidnapping and aggravated robbery. The aggravating circumstance found by the jury on the second count of murder was that the murder was committed while Defendant Thomas was engaged in aggravated kidnapping. First, as we discussed in Issue I, the evidence presented at trial was more than sufficient to convict him of especially aggravated kidnapping. Second, we likewise find the evidence sufficient to support the aggravator that the murder was committed during the perpetration of a robbery. Defendant Thomas alleges that the gold herringbone necklace found in his hotel room was not properly identified. Rodney Edwards testified that victim Asberry's gold herringbone necklace was taken from him before he was killed. At trial, victim Asberry's sister, Jennifer, testified that the necklace found in Defendant Thomas' drawer was in fact her brother's necklace. In making this identification, the victim's sister testified that the necklace was distinctively dented in many places. She said the victim dented it purposely to make it look different from his two sisters' necklaces. In addition, she testified the clasp was not functioning properly. The herringbone necklace found in Thomas' hotel room had distinctive dents and a broken clasp. This was sufficient evidence from which the jury could have concluded that the necklace was that of victim Asberry's.

Defendant Thomas also alleges that proper identification could not be made because the officer who recovered the necklace did not tag it on the day it was found. Apparently Lieutenant Rogers secured the necklace in a safe overnight and then tagged it the next day. Defendant Thomas implied during cross-examination of Lieutenant Rogers that someone could have gone to the property division of the

police station, broken into the safe, removed the necklace that was there, and put the victim's necklace in place of the one taken. However, we find that the fact the necklace was in the secure area overnight, that it was tagged the next day, and that the officer stated it looked like the necklace he recovered from Defendant Thomas' hotel room, was sufficient to establish the identity of the necklace.

Defendant Thomas also alleges that even if the necklace was properly admitted into evidence, no jury could have tied it to him because there were other people who may have been staying in his hotel room. The necklace was found in the room where Thomas lived and in the same drawer as Thomas' wallet. A jury could have concluded that Defendant Thomas put the necklace there with his wallet when he returned to the room and emptied his pockets. Accordingly, we find that the aggravator that the Defendant committed a robbery during the murder was properly applied.

B. Sentencing

Defendant Thomas presents no argument on this issue and fails to even cite any authority, and therefore, this issue should be waived. See Tenn. R. App. P. 27(a)(7). He simply states that he was not the leader, he had a minimal criminal record, and he received an honorable discharge from the military. Nevertheless, we will address the merits of this issue.

When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn.

Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). There are, however, exceptions to the presumption of correctness. First, the record must demonstrate that the trial court considered the sentencing principles and all relevant facts and circumstances. Id. Second, the presumption does not apply to the legal conclusions reached by the trial court in sentencing. Third, the presumption does not apply when the determinations made by the trial court are predicated upon uncontroverted facts. State v. Smith, 898 S.W.2d 742, 745 (Tenn. Crim. App. 1994), perm. to appeal denied, id. (Tenn. 1995).

Our review requires an analysis of: (1) The evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, & -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the facts and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Consecutive sentences (unless mandated by statute or rule) should be imposed only after the proof establishes (1) that the terms imposed are reasonably related to the severity of the offenses committed; (2) the sentence is necessary to protect the public from further criminal acts by the offender; and (3) that the defendant meets at least one of the criteria as set forth in Tennessee Code Annotated section 40-35-115(b). State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995).

In sentencing Defendants Thomas and Winters to consecutive sentences, the court stated the following:

> The [c]ourt would further order as to each of the defendants, and the [c]ourt finds based on all the evidence in the case, the type of activity, the [c]ourt finds from the proof that they seem to be very dangerous actors who do have the potential for and the danger of being a danger to this community and a danger to other parties and a danger apparently under the present circumstances.
>
> The [c]ourt finds that the murder charges as to each defendant should be run consecutive, one to the other, and the other offenses would be run concurrent with those charges.

Based on the foregoing, the trial court obviously found Defendant Thomas to be a dangerous offender. However, a finding that a defendant is a dangerous offender, standing alone, will not justify consecutive sentencing. See, e.g., State v. Braden, 867 S.W.2d 750 (Tenn. Crim. App. 1993); State v. Woods, 814 S.W.2d 378 (Tenn. Crim. App. 1991). A finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed must also be established. Wilkerson, 905 S.W.2d at 939.

We find from the record that consecutive sentencing is necessary to protect the public against further criminal conduct by Defendant and that consecutive sentencing is reasonably related to the severity of the offenses committed. See id. Defendant's behavior demonstrated a contemptible lack of concern for human life and an absence of human decency. Defendant Thomas took the two boys to the abandoned house under the pretense of smoking dope. The victims were then forced into the house, and after listening to their pleas for mercy, Defendant Thomas brutally shot them. One of the victims said he would give them anything they wanted, but they were killed anyway and left to die on a floor covered in human waste. Even from behind bars, Defendant Thomas has continued to make threats clearly demonstrating the need to be confined. Although the trial court failed to make the specific findings required by Wilkerson, we find that the appropriate factors are clearly present under our power of de novo review. Tenn. Code Ann. § 40-35-401(d). Consecutive sentencing is appropriate in this case. This issue is without merit.

Based on all the foregoing, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, Judge

CONCUR:

_____
JOHN H. PEAY, Judge

_____
JOE G. RILEY, Judge